## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TRINETTE C. PROVSTGAARD** | **CIVIL ACTION** |
| **VERSUS** | **NO: 11-1496-SSV-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Trinette C. Provstgaard ("Provstgaard"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, as well as her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On March 17, 2009, Provstgaard completed applications for benefits. R. 90-104. She reported that she became unable to work on November 15, 2008, r. 90, because: (1) she was unable to lift or stand; (2) she was in discomfort while sitting; (3) she had trouble bending; (4) the pain was constant; (5) there was tingling in her finger tips; and (6) she needed assistance getting in and out of a bathtub. R. 110. On July 28, 2009, the applications were denied. R. 48-51. There was a hearing before an Administrative Law Judge ("ALJ") on March 10, 2010. R. 26. On April 26, 2010, the ALJ issued an unfavorable ruling. R. 15-22. On May 3, 2011, the Appeals Council denied Provstgaard's request for review. R. 1-6. On June 23, 2011, she filed a complaint in federal court.

Rec. doc. 1. On November 18, 2011, she filed a motion for summary judgment. Rec. doc. 12. On January 5, 2012, the Commissioner filed a cross-motion for summary judgment. Rec. doc. 13. Provstgaard is represented by counsel.

**STATEMENT OF ISSUE ON APPEAL**

<u>Issue</u>. Whether the ALJ erred in failing to accord the opinions of the treating physician controlling weight, or at least significant weight?

**THE COMMISSIONER'S FINDINGS RELEVANT TO THE ISSUE ON APPEAL**

The ALJ made the following findings relevant to the issue on appeal:

1. Provstgaard met the insured status requirements of the Act through December 31, 2012.

2. Provstgaard had not engaged in substantial gainful activity since November 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. Provstgaard had the following severe impairments: Multilevel Degenerative Disc Disease and Chronic Pain (20 CFR 404.1520(c) and 416.920(c). These are severe impairments within the meaning of <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

4. Provstgaard did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the ALJ found that Provstgaard had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6. Provstgaard was capable of performing her past relevant work as a deli worker. This work does not require the performance of work-related activities precluded by Provstgaard's residual functional capacity (20 CFR 404.1565 and 416.965).

7. Provstgaard has not been under a disability, as defined in the Social Security Act, from November 15, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.020(f)).

R. 17-22.

## ANALYSIS

a. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show

that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

---

[1] The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).
Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

4

gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez v. Barnhart, 415 F.3d at 462. "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b. **Testimony at the Hearing.**

Provstgaard lived in Kentwood, Louisiana. R. 28. She was 36 at the time of the hearing. R. 31. She was not married, but she had a common law husband and they had three children. R. 31. She completed the eleventh grade and did not have a GED. R. 37.

For nearly four years she had worked in a deli at a Piggly Wiggly grocery store where she was the manager of the deli. R. 31-32. Thereafter she worked at John's Corner Market in the kitchen and as a cashier. R. 32. Her next job was at Sunflower, a grocery store, where she worked in the deli. R. 32. Her last job was at One Manor Nursing Home where she worked in the kitchen. R. 32. She was denied unemployment because she was not injured at work. R. 33 and 37.

On November 15, 2008, she woke up and fell on the floor. R. 32-33. She went to Dr. Fowler who gave her two injections and sent her to Dr. Hortman at the Bogalusa Medical Center for an MRI. R. 33. Since the initial visit to Dr. Fowler, she has been treated by Dr. Hortman. R. 41. She reported seeing a neurologist in Shreveport, but could not remember his name. R. 40.

She testified that she was unable to lift or stand as required by her job. R. 33. She could not work because any activity like washing dishes, lifting or standing for eight hours caused pain. R. 39. She could not lift because it placed a strain on her back. R. 39. The longest she could sit before she had to stand was about ten minutes. R. 34 and 36. She could not stand in one position for more than a minute. R. 36. Even with frequent changes in her position, she could not stand for more than ten minutes before she had to sit down. R. 36. She was unable to walk a block before she experienced excruciating pain and her legs gave out. R. 36. She could not squat. If she went down, she could not get back up. R. 37.

She experienced severe tingling in her right arm. R. 33. When she leaned her head backwards or to the side, it made her finger tips numb and she lost circulation in her arm. R. 33. When the pain in her back radiated into her legs, they became numb. R. 33. Her back pain became worse if she had to sit or stand for too long. R. 33. She received some temporary relief from the pain with medication and hot tub baths. R. 34. Her neck pain became worse when she had to focus on something. R. 34. Physical therapy did not help; it made the pain worse. R. 35. Because of the pain, she had difficulty doing laundry, washing dishes, sweeping, and pulling heavy blankets on a bed. R. 35. She had trouble sleeping because of the pain. R. 37. She had difficulty with her personal hygiene. R. 38.

In a normal day, she fixed her bed, fed her pets, cleaned a little, and watched television. R. 38. She could fold a few clothes at a time. R. 35. Her oldest son helped her with the dishes. R. 35. Her husband went to the grocery store. R. 35. If she cooked, she did the preparation at a table so she could sit. R. 36. She used to fish, but she had not fished in a year. R. 39.

At the time of the hearing she smoked about three-quarters of a pack a day. R. 37.

6

Based on the hypothetical question, the vocational expert testified that Provstgaard could perform her past work in a deli. R. 44. With the limitations described by Dr. Hortman, the expert testified that she could not do any work. R. 44-45.

c.  **Medical Evidence**.

On May 13, 2005, there was an x-ray from Hood Memorial Hospital in Amite of the lumbar spine because of complaints of low back pain. Minimal disc space narrowing was observed at L5-S1. The exam was otherwise negative. R. 169.

On November 30, 2007, Provstgaard went to the Kentwood Medical Clinic ("KMC") with complaints of vomiting, raw throat, chills, body aches, headache, general soreness, nausea and lightheadedness. R. 170-72 and 177. On December 3, 2007, she returned to KMC with complaints of low back pain. R. 176.

On November 3, 2008, she returned to KMC with sciatic pain. R. 175. She was referred to the Bogalusa Medical Center ("BMC") for an evaluation. R. 291 and 295. She reported sharp radiating pain. R. 287. X-rays of the lumbar spine, sacrum and coccyx revealed well-maintained disc spaces, no fractures and no soft tissue pathologies. Several tiny spurs were developing on the lumbar spine. R. 284-85. There is a discharge note reporting that her husband said, "[w]e didnt' get anything done that we came for." R. 289.

On November 18, 2008, she returned to KMC with complaints of back pain. She was taking medication. R. 174. On January 12, 2009, she went to the St. Helena Community Health Center ("SHC") for a prescription for pain medication and an appointment with a specialist. R. 173. On January 20, 2009, she returned to SHC with complaints of back pain. She refused to see Dr. Pereda. R. 173. On January 21, 2009, she returned to SHC with complaints of back pain. R. 173.

On January 23, 2009, she went to BMC for a routine visit for back pain. She reported pain in her low back, neck and right arm and numbness. Diagnostic studies were ordered. R. 208-09. The cervical and lumbar spine disc spaces were well maintained; no fracture or soft tissue pathology was seen; and the odontoid was unremarkable. No pathology was seen. R. 185, 187, 200 and 201.

A February 5, 2009 MRI of the lumbar spine revealed: (1) posterior central herniation of the L5-S1 intervertebral disc; (2) broad based posterior bulging of the L4-5 intervertebral disc; and (3) subtle posterior bulging of the L3-4 intervertebral disc. R. 181-82 and 205-07. On February 10, 2009, she was seen at BMC. She was urged to stop smoking. It was noted that she needed to see an orthopedist. R. 211-12. A February 17, 2009 MRI of the cervical spine revealed: (1) posterior bulging of the C3-4, C5-6, and C6-7 intervertebral discs; and (2) reversal of the cervical lordosis indicative of a pattern of muscle spasm. R. 178-80 and 192-94. On March 11, 2009, she was seen at BMC. She continued to complain of pain. It was noted that she needed a referral to a neurosurgeon or orthopedist. She did not want to stop smoking. R. 213-214.

Provstgaard was referred to physical therapy ("PT"). R. 254. On March 18, 2009, there was an initial PT appointment. It was noted that: (1) she reported neck and low back pain; (2) she demonstrated some exaggeration of pain; (3) there was inconsistency in the range of motion measurement versus the observed range of motion; and (4) her husband appeared to be coaxing her pain level. R. 251-52 and 255-56. On March 24, 2009, she was seen for PT. She reported pain, but was able to do some exercises. R. 250. On March 31, 2009, she was discharged from PT. It was noted that she continued to have pain in the neck and low back. She was able to perform exercises slowly. She was unable to attend regular PT sessions because of the distance she was required to travel. R. 246-47 and 249.

8

On May 13, 2009, she was seen at BMC with complaints of pain. It was noted that: (1) the cervical and lumbar disc conditions were unchanged; (2) she needed to stop smoking; and (3) she was referred for pain management. R. 243 and 245. On May 18, 2009, she was seen at BMC with complaints of pain in her neck and back. R. 240-41.

On July 11, 2009, she was seen by Cristino Dijamco, M.D., an internist. She reported back problems for the previous six years and that she hurt all over. She reported going to BMC six months earlier for severe back pain at which time she passed out. She did not appear to be in distress. She walked without an assistive device. She had some difficulty getting on and off of the examining table. For the examination of her spine and extremities, the range of motion her cooperation was suspected. R. 216-19.

On July 28, 2009, she reported pain at the LSU-Shreveport-Ambulatory Care Division. R. 312-13

On August 5, 2009, she was seen at BMC for complaints of pain in her back, shoulder, neck and arms. She obtained some relief from Soma, a muscle relaxant. She smoked tobacco and marijuana. R. 238-39.

On October 15, 2009, she was seen at BMC for shoulder spasms and burning in her lower back. She reported seeing a neurosurgeon, who told her that she had an inoperable lumbar disc. R. 236-37. On October 15, 2009, Dr. Hortman completed a physical capacity evaluation ("PCE"). R. 298-300. In it, he reported very restricted physical abilities and "extreme" limitation on ability to complete normal work.

On October 26, 2009, there was an MRI of the cervical spine. There were multilevel mild degenerative changes with more prominent degenerative changes at the C5-C6 level. R. 232-33.

9

d. **Plaintiff's Appeal.**

<u>Issue</u>. Whether the ALJ erred in failing to accord the opinions of the treating physician controlling weight, or at least significant weight?

Provstgaard contends that: (1) the ALJ failed to accord Dr. Hortman's opinions the controlling weight to which they are entitled;[2] (2) they are supported by multiple x-rays, MRIs, clinical findings from years of treatment, and prescriptions for pain medication and muscle relaxants; (3) the ALJ rejected them without evaluating them in accord with the factors enumerated in the Regulations;[3] (4) the ALJ failed to seek any clarification from Dr. Hortman before rejecting his opinions; and (5) the factors enumerated in the Regulations and <u>Newton v. Apfel</u>, 209 F.3d 448, 456 (5th Cir. 2000), weigh in favor of according Dr. Hortman's opinions the greatest of weight. The Commissioner responds that: (1) Provstgaard's impairments did not prevent her from performing the full range of light work activities; (2) the record did not support Dr. Hortman's assessment of disabling limitations; (3) the ALJ's decision demonstrates that the factors found in <u>Newton</u> were considered; (4) there is substantial evidence to support the finding that Provstgaard's testimony as to her limitations was not credible; (5) the Fifth Circuit does not require procedural perfection;[4] and (6) Provstgaard is requesting that the Court reweigh the evidence.

In making the finding that Provstgaard had the residual functional capacity to perform a full range of light work, the ALJ began with a description of the procedure she was required to follow. R. 18-19. The ALJ then described Provstgaard's allegations concerning her limitations. R. 19. The

---

[2] On October 15, 2009, Dr. Hortman completed a physical capacity evaluation ("PCE"). R. 298-300. The vocational expert testified that no work could be performed with the limitations reported in the PCE. R. 45.

[3] 20 C.F.R. §§ 404.1527(d), 416.927(d).

[4] <u>Mays v. Bowen</u>, 837 F2d 1362, 1364 (5th Cir. 1988).

ALJ found that:

> [Provstgaard's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimants statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity.

R. 19. The ALJ reviewed the diagnostic records, including MRIs and x-rays, the clinical records from Dr. Hortman, the report of the consultative examination by Dr. Dijamco, treatment notes from LSU, including a neurological examination, and Dr. Hortman's October 15, 2009 PCE. R. 19-20. The ALJ described Provstgaard's testimony at the hearing concerning her limitations. R. 20-21. The ALJ stated:

> Given the evidence as presented in the record, the undersigned finds that the claimant has severe musculoskeletal problems involving both the cervical and lumbar spines. This was verified through radiographic studies. However, functional limitations, although existing, did not support a total inability to function, as indicated by the claimant and the claimant's treating source, Dr. Hortman in his functional assessment. . . .

R. 21. The ALJ found that the intensity, severity and persistence as well as the functionally limiting effects of the alleged limitations, were disproportionate to that expected for the established medically determinable impairments. R. 21. The ALJ referred to the objective evidence and the record as a whole and stated,

> [T]here is little other than the minimal objective findings obtained every 3 months exam by her treating physician and the MRIs that indicate the existence of the impairment. Limitation of function, however, is not well supported. The treating physician gives an exaggerated assessment of function . . . which is not at all substantiated by the medical evidence in his own records.

R. 21. The ALJ determined that the conclusion by the state agency that Provstgaard was capable of engaging in a full range of medium exertion was not effectively supported by the evidence. Id. The ALJ did not give significant weight to Dr. Dijamco's opinion that there were no significant

11

deficits because the preponderance of the evidence supported limitations. Id. The ALJ concluded that:

> In summary, the medical evidence supports the existence of severe impairments that cause some functional restrictions; however the impairments singularly or in combination do not restrict the claimant from performing normal daily activities or from completing normal routine tasks.

R. 22.

In Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985), the ALJ rejected the treating physician's opinion that the claimant was totally disabled. In reversing and remanding the Fifth Circuit said:

> This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability. There are exceptions to this principle. The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence. The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is "leaning over backwards to support the application for disability benefits." The administrative fact finder is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.

770 F.2d at 485.

In Newton, the Fifth Circuit found that the ALJ did not give any weight to the opinions of the claimant's treating specialist. 209 F.3d at 455. The record does not disclose a speciality for Dr. Hortman. He was the physician seen by Provstgaard at BMC on November 3, 2008 on the referral from KMC for an evaluation of sciatica. R. 291. and 295. It can be inferred that he is not an orthopedist or a neurologist, because his notes reflect referrals to those specialists. R. 209, 212 and 214.

Newton was not a case where there was competing first-hand medical evidence and the ALJ found as a factual matter that one doctor's opinion was more well-founded than another. Id. at 458. Unlike Newton, here the ALJ was confronted with competing first-hand medical evidence from Dr. Dijamco. The ALJ did not give significant weight to the opinion of Dr. Dijamco. R. 21. The ALJ, however, did not reject Dr. Dijamco's findings. For example, Dr. Dijamco's neurologic and sensory examination found that "[t]here was no spasticity and no atrophy, no focal or neurological, sensory or motor deficits." R. 218. This finding is not consistent with Provstgaard's description of her limitations. This is not a case where the ALJ accorded great weight to the opinion of one physician and little weight to the opinion of the other physician.

In Newton, the Fifth Circuit reversed and remanded for the ALJ to perform the analysis required by SSR 96-2p, 1996 WL 362211, before rejecting the treating physician's opinion. The Court said:

> This court now similarly holds that an ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinion of the claimant's treating specialist. The ALJ failed to perform this analysis, which should be conducted on remand.

Id. at 456. The Fifth Circuit described the factors as follows:

1. The physician's length of treatment of the claimant.

2. The physician's frequency of examination.

3. The nature and extent of the treatment relationship.

4. The support of the physician's opinion afforded by the medical evidence of record.

5. The consistency of the opinion with the record as a whole.

6. The specialization of the treating physician.

13

Id. at 456.

Because the ALJ did not accord great weight to Dr. Dijamco's opinion, the ALJ was required to consider the Newton factors before rejecting the opinions expressed by Dr. Hortman in the October 15, 2009 PCE (R. 298-300). The Commissioner acknowledges that, "[w]hile the ALJ did not compartmentalize each factor . . ., the ALJ's decision demonstrates that she considered these factors." Rec. doc. 13 at 5. "Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected." Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988). The issue is one of substance (whether the Newton factors were considered by the ALJ) and not one of form (whether the ALJ's decision enumerates each of the factors).

The first factor is Dr. Hortman's length of treatment of Provstgaard. Dr. Hortman first saw Provstgaard on January 23, 2009. R. 208. This record of Provstgaard's treatment by Dr. Hortman is noted by the ALJ. R. 19. She returned to Dr. Hortman on February 10, 2009. R. 211. On March 11, 2009, she was seen by Dr. Hortman. R. 213. The ALJ noted this visit in his decision. R. 19. Two months later she was seen by Dr. Hortman on May 13 and 18, 2009. R. 240 and 243. Nearly three months later on August 5, 2009, she was seen by Dr. Hortman. R. 239. She returned to Dr. Hortman two months later on October 15, 2009. R. 236. On that day, he completed the PCE. The ALJ noted this in his decision. R. 20. The length of treatment by Dr. Hortman, nine months, was considered by the ALJ.

The frequency of Dr. Hortman's examination was considered by the ALJ. Provstgaard was seen by Dr. Hortman about every two to three months. The ALJ referred to it as every three months. R. 21.

The ALJ described the nature and extent of the treatment relationship between Dr. Hortman

and Provstgaard. R. 19-21.

The fourth and fifth factors are the determinative factors in the ALJ's decision to accord no weight to Dr. Hortman's October 15, 2009 PCE. The ALJ found that Dr. Hortman's assessment was not supported by the record medical evidence in his own records and the functional limitations were not supported by the evidence in the record as a whole. R. 21. The record demonstrates that the ALJ considered the fourth and fifth factors.

In the PCE Dr. Hortman indicated that in an eight hour work day, Provstgaard could stand less than one hour, walk less than one hour, sit less than one hour and occasionally lift less than ten pounds. R. 298. Because of pain, she suffered from an extreme limitation in her ability to complete a normal work day and work without interruption due to medically based symptoms. R. 300.

The record for each of Provstgaard's visits to Dr. Hortman demonstrates that she was ambulatory when she arrived.[5] In the functional portion of the notes she was described as ambulatory and performing the activities of daily living. There are no notations that she required a walker or a cane or any other limitations. In each note she was described as a smoker who refused to stop smoking. None of the notes refer to hospitalization for pain. Although pain medication and muscle relaxants were prescribed, there are no reports by Dr. Hortman that she was given an epidural injection for pain. She needed a referral to an orthopedist or a neurologist, but the notes indicate that the neurologist told Provstgaard that her condition could not be treated with surgery. She was referred to physical therapy. Dr. Hortman's notes of Provstgaard's visits provide substantial evidence for the ALJ's conclusion that Dr. Hortman's October 15, 2009 assessment (R. 298-300) was not supported by the medical evidence in his own records.

---

[5] See R. 208-09 (January 23, 2009), R. 211-12 (February 10, 2009), R. 213-14 (March 11, 2009), R. 243 and 245 (May 13, 2009), R. 240-41 (May 18, 2009), R. 238-39 (August 5, 2009), and R. 236-37 (October 15, 2009).

Although Provstgaard testified that the longest she could sit before she had to stand was ten minutes (R. 36) and Dr. Hortman reported that in an eight hour work day her sitting was limited to less than an hour (R. 298), Provstagard testified that she rode with her husband to the grocery store and sat in the car while he went into the store (R. 35). Provstgaard reported difficulty with her personal hygiene (R. 37-38), but Dr. Hortman's notes did not indicate any problems with the activities of daily living. The physical therapist recorded that Provstgaard demonstrated some exaggeration of pain, inconsistencies in the range of motion, and her husband appeared to be coaxing her pain level, including physically lifting her onto the mat. R. 252. Dr. Dijamco noted that Provstgaard's cooperation on the measurement of the range of motion was suspected. R. 218 and 219. There is substantial evidence for the ALJ's conclusion that Dr. Hortman's functional limitations were not supported by the evidence in the record as a whole.

The record demonstrates that the ALJ did not err in failing to accord Dr. Hortman's October 15, 2009 PCE controlling or significant weight.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that Commissioner's cross-motion for summary judgment (Rec. doc. 13) be GRANTED and Provstgaard's motion for summary judgment (Rec. doc. 12) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of April, 2012.

**SALLY SHUSHAN**
**United States Magistrate Judge**